

NIGHT BOX
FILED

FEB 19 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 97-6007-Cr-Moreno (s)(s)(s)/Garber

UNITED STATES OF AMERICA,

v.

BEAUDOUIN KETANT,
  a/k/a "Jacques Ketant,"
  a/k/a "Jack Ketant,"
  a/k/a "Palmiste 2,"

        Defendant
_____/

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America respectfully submits the following memorandum in aid of the scheduled February 25, 2004 sentencing hearing in this case.

**1.    Procedural Background.**

On August 28, 2003, Beaudouin Ketant (hereinafter "the defendant") entered guilty pleas, pursuant to a written plea agreement with the United States, to Counts 1 and 5 of the third superseding Indictment in this case, which charged the defendant with conspiracy to import into the United States a Schedule II controlled substance, that is: cocaine, in violation of 21 U.S.C. §§ 952(a) and 963 (Count 1); and conspiracy to launder monetary instruments, in violation of 18 U.S.C. §1956(h) (Count 5) (DE: 1104). The indictment also alleged that the defendant profited by his illegal activities and sought the forfeiture of $15,000,000 in drug and money laundering proceeds and property used to facilitate the drug and money laundering violations, pursuant to 21 U.S.C. § 853(a) and 18 U.S.C. § 982(a)(1).



As part of his plea agreement, the defendant agreed to

forfeit to the United States voluntarily and immediately all of his right, title and interest to any and all assets which are subject to forfeiture pursuant to Title 21, United States Code, Section 853 and Title 18, United States Code, Section 82. The defendant further agrees to **identify and forfeit** to the United States all domestic and foreign assets over which the defendant exercises, or has exercised, control and/or ownership, directly or indirectly, or in which the defendant now has, or previously had, any financial interest since 1986: (a) which constitute proceeds of illegal drug trafficking, or were derived from any proceeds the defendant obtained directly or indirectly, as a result of illegal drug trafficking; (b) which constitute property involved in money laundering activities or traceable to such property; and (c) which are or were property used, or intended to be used, in any manner or part, to commit, or facilitate the commission of illegal drug trafficking. Such assets included, but are not limited to, (1) the property identified in the third superseding indictment; (2) the defendant's real and personal property located in the Republic of Haiti and the United States; (3) cash held by, or for the benefit of, the defendant, wherever located; and (4) the contents of any and all financial or investment accounts controlled by, or held for the benefit of, the defendant. The defendant also agrees to identify all other real or personal property in which he has an ownership or beneficial interest which would constitute substitute assets because the original assets subject to forfeiture in subsections (a), (b), and (c) have been transferred, sold, devalued, dissipated, or destroyed.

The defendant further agrees to fully assist the United States and promptly take all steps as requested by the United States to pass clear title to assets forfeitable to the United States, including, but not limited to, assisting the United States in taking possession of and successfully forfeiting any and all such assets through either criminal forfeiture proceedings, civil forfeiture proceedings, or administrative forfeiture proceedings (whichever may be appropriate depending upon the asset at issue), including, but not limited to, repatriating assets, executing consents to forfeiture, executing quitclaim deeds to real property, providing truthful information and testimony at any ancillary or civil forfeiture proceedings, and obtaining relevant identification and ownership documents relating to the assets. The defendant further agrees to waive any and all interest in any such assets in any forfeiture proceeding. The defendant further agrees that he will not take any steps, either individually or through his agents,

> relatives, attorneys, or assigns, to sell, dissipate, transfer, remove, deplete, or otherwise destroy any such assets to prevent their transfer and forfeiture to the United States (emphasis added).

(DE: 1104, at ¶ 14).

Before the scheduled sentencing hearing, the United States Probation Office prepared a Presentence Investigation Report ("PSR"), in which it determined the defendant's base offense level to be Level 39, and his criminal history category to be Category I, resulting in a presumptive sentencing guideline range of 262-327 months' imprisonment. Nether the government nor the defendant have filed any objections to the PSR; likewise, neither party has submitted any written motions requesting that the Court either depart upward or downward from the presumptive guideline range.

The defendant's sentencing hearing began on December 11, 2003; however, following the government's allocution, this Court continued the hearing until February 25, 2004, to allow the defendant additional time to produce his ill-gotten assets to the United States as required by his plea agreement. To date, the defendant has yet to repatriate or otherwise produce any forfeitable assets to the government.

2.  **Factual Background.**

   a.  **The Indictment.**

As outlined in the PSR, the defendant was the head of a large and complex conspiracy which was responsible for the importation and distribution of nearly 30,000 kilograms of cocaine in the United States from 1987 through 1996. According to the indictment, from approximately June 1987 through November 1996, the conspirators engaged in a course of action designed to establish a cocaine transportation and distribution network through the Republic of Haiti, employing in large

3

part the political and military institutions of that country, and to use that network, among other means, to import and subsequently distribute thousands of kilograms of cocaine into the United States, thereby reaping millions of dollars in illicit profits. The cocaine was brought into Haiti from Colombia, Panama, or Curacao, stored and repackaged in Haiti, and then transported into the United States for distribution.

In September 1991, Haitian military officers and other persons executed a *coup d'état* and removed Jean Bertrand Aristide from power and replaced him with a military junta. As one of the *de facto* leaders of Haiti, codefendant and fugitive Joseph Michel Francois placed the political and military structure of the Republic of Haiti under his control. Francois made himself the Chief of Police of Port-au-Prince and further arranged for codefendant Marc Valme to become Chief of Security of the Port-au-Prince International Airport. As such, Valme supervised and controlled over 100 armed military men. Francois was introduced to the defendant by other Haitian traffickers. The defendant then utilized Francois' connections and bodyguards to safeguard his cocaine. Francois also allowed the defendant to utilize the services of Valme to place his cocaine-laden suitcases on board aircraft bound for the United States. As the defendant admitted during his change of plea colloquy with the Court, he was personally responsible for importing into the United States and distributing at least 1,000 kilograms of cocaine during the period of time covered by the conspiracy.

Valme assisted the Francois/Ketant organization by allowing cocaine-laden couriers to travel through the Port-au-Prince airport undetected. Valme further directed his armed men to allow the couriers to continue their travel unmolested even when X-ray equipment revealed the presence of cocaine in their carry-on luggage. The defendant collaborated with a number of individuals who imported the cocaine into the United States after it was trans-shipped through Haiti. Codefendant

4

Menard Saul was the defendant's brother-in-law and worked in the Ketant organization as the defendant's right-hand man in the United States who oversaw the organization's cocaine distribution and money collection activities when the defendant was in Haiti. Two other independent large scale importers working with the Ketant organization were codefendants and fugitives Frantz Cadet and Fritz LaFontante. LaFontante was the defendant's criminal partner through approximately 1993 and then began to operate his cocaine business, however, continued to utilize the same corrupt officials, both in Haiti and in the United States, whom the defendant and LaFontante previously cultivated.

To facilitate the entry of the narcotics into the United States, the defendant and LaFontante bribed key personnel at Miami International Airport, including codefendant Evens A. Gourgue, a Miami-Dade County employee assigned to the airport. Those corrupted individuals helped smugglers with cocaine-laden suitcases and body couriers escape detection and searches by U.S. Customs Service personnel as they entered into the United States from Haiti aboard commercial aircraft. The defendant and other co-conspirators also corrupted and bribed Immigration and Naturalization ("INS") Inspector and codefendant Joel G. Audain, who was assigned to the Miami International Airport, to assist the organization with the importation of cocaine into the United States. Beginning as early as 1989 and continuing through 1996, Audain assisted the co-conspirators, including the defendant's couriers, by allowing cocaine-laden couriers into Miami undetected by utilizing secure elevators and locked doorways at the Miami International Airport which allowed them to avoid Customs inspections or searches. Audain also assisted the organization by utilizing his ability to access secure criminal intelligence information which named co-conspirator Cadet as being under active criminal investigation and assisted Cadet in avoiding

5

apprehension by warning him of those facts. Audain also had knowledge of, and indirectly participated in, Gourgue's criminal conduct at the Miami International Airport.

The defendant organized a broad transportation and distribution network for his contraband in many areas of the United States, including Ft. Lauderdale, Miami, West Palm Beach, New York and Chicago. Hundreds of kilograms of cocaine which had been smuggled into the United States were distributed through this network. Couriers included codefendants Reginald Molin, Jean Toussaint, Wilner Noel, Luckner Guillaume and Gourgue. Distributors included codefendants Guy Plantin, Pierrot Beauvais, Derrick Maddox, Guillaume, Toussaint and Molin.

The defendant and Saul utilized the businesses of co-conspirators to launder their illegal profits from the drug trade. The defendant, Saul, LaFontante, Toussaint, Guillaume and other co-conspirators smuggled the laundered currency out of the United States back into Haiti for reinvestment in the cocaine business. The defendant was responsible in laundering at least $15,000,000 in drug proceeds during the period of time covered by the charged conspiracy.

From November 1995 through January 1996, Saul's cellular telephone was wiretapped. A number of conversations regarding criminal activity were intercepted during this time period. As a result of those interceptions, on December 7, 1995, law enforcement seized approximately $260,000 from Saul, of which $210,000 came from codefendant Maddox at a surveyed meeting. In mid-January 1996, in coordination with the defendant, Saul participated in the arrangements to pick up 59 pounds of cocaine from a stash house in Carol City, Florida. On January 16, 1996, Saul took Toussaint in Guillaume's vehicle to accomplish the pick up. Toussaint departed the stash house alone with the cocaine, but was stopped. The cocaine was seized.

According to the indictment, the defendants moved large amounts of U.S. currency both from Haiti to the United States and from the United States to Haiti. Portions of the illegally derived funds were used to pay bribes to politicians, government officials, and military officers in Haiti to facilitate the illegal activities of the co-conspirators, to receive intelligence information and to otherwise protect the co-conspirators.

On May 8, 1996, the defendant dropped a bag that he was carrying which contained nine (9) kilograms of cocaine as he was being approached by DEA agents. Although agents seized the bag containing cocaine, the defendant fled from arrest and traveled to Miami where he later escaped apprehension by disguising himself as a woman and fleeing to Haiti.

**b.     Post Indictment Activity and Assets.**

In May 2003, the defendant was involved in an incident at the Union School in Port-au-Prince, Haiti. The defendant and his bodyguards were involved in a violent altercation involving the assault of a school official. Children of United States Embassy personnel and members of the Haitian government attend this school. As a result of this incident, the Haitian government expelled the defendant from Haiti and notified the United States Embassy of its intentions. On June 17, 2003, members of the Haitian police force arrested the defendant and expelled him from Haiti. Drug Enforcement Administration representatives took custody of the defendant upon his expulsion and brought him in custody to the United States on June 18, 2003.

Since fleeing to Haiti in May 1996, and despite the open arrest warrant for him as a result of the initial indictment returned in this case in early 1997, the defendant continued to traffic in massive quantities of illegal drugs while living openly and lavishly on his narcotics proceeds. In the year prior to his expulsion from Haiti, the defendant claimed to have imported from Colombia

approximately 2250 kilograms of cocaine, the majority of which was trans-shipped to the United States for distribution. Based on the figures the defendant provided concerning his illegal profits from his drug business, he earned over $13,000,000 from the distribution of the 2250 kilograms of cocaine during the 2002-2003 time frame alone.

In the course of his drug trafficking activities, the defendant accumulated Midas-like quantities of material assets. The defendant claimed that he owned at least five (5) homes in Haiti, the most expensive of which is worth an estimated $8,000,000. The other four (4) homes have a combined worth of $1,500,000. The defendant also owns a leasehold interest in a prominently-placed Texaco gas station in Port-au-Prince, Haiti worth approximately $800,000. The defendant also acknowledged owning four vehicles, including a brand new H2-Hummer and a 2001-2003 Cadillac Escalade. Additionally, the defendant claimed to own an extensive fine art collection that is comprised of nearly 300 valuable paintings, including a "Monet" and "Picasso," worth an estimated $1,000,000. The defendant had approximately $4,000,000 to $5,000,000 in cash hidden in a safe inside his mansion in Haiti. The defendant also maintained three (3) bank accounts; two (2) in Haiti with a total of $135,000 on deposit, and one (1) in Nassau, Bahamas with an estimated $80,000 on deposit. The defendant's family thrives on this illicit wealth. For example, one of the defendant's daughters, Samantha Ketant, attends Emory University in Atlanta, Georgia, which tuition of $40,000 annually the defendant claims to have paid in cash. This daughter also drives a 2003 Mercedes Benz automobile while pursuing her higher education in this country, the cost of which would be prohibitive to the vast majority of working Americans.

By his plea agreement and during the defendant's change of plea colloquy with the Court, the defendant admitted his personal responsibility for the importation and distribution of over 1,000

kilograms of cocaine and he further agreed to the forfeiture of the profits of those trafficking activities, which profits he admitted totaled at least $15,000,000. Nevertheless, despite his promise to pay the United States $15,000,000, and a court order enforcing that promise, the defendant has paid only a few thousand dollars to the court to cover the costs of his court-appointed counsel.[1] To justify his failure to fulfill his obligations under the terms of the plea agreement, the defendant has consistently maintained that the vast majority of these assets were stolen by his ex-wife Sibylle Joseph. Ms. Joseph has denied under oath taking any of the defendant's assets.

The defendant's plea agreement required a truthful identification and disgorgement of all of assets derived from or involved in his narcotics trafficking and money laundering activities. *See* ¶ 14 of Plea Agreement. As this Court accurately noted at the aborted December 11, 2003 sentencing "the concern I had is, the suggestion that someone who has so much money and so much power now has so little control and power." *See* Transcript, p. 34. The United States shares the Court's concerns and, quite frankly, disbelieves the defendant's protestations of poverty. In an attempt to verify the defendant's claims, the government requested that he submit to a polygraph examination designed to ferret out whether he, in fact, has directed others to conceal his assets from the government and whether he has concealed any assets from the government. As to both issues, the polygraph examiner conclusively determined that the defendant gave deceptive responses through his denials to those questions.[2]

---

[1] The undersigned AUSA was recently advised by Joel DeFabio, the defendant's first retained attorney, that he has not been paid his agreed-upon fee.

[2] While the formal written report has yet to be signed off and approved, the polygraph examiner, DEA Special Agent Dave Stevens, told the case agent on the date the test was administered, February 10, 2004, that the defendant "failed miserably."

3.  **Recommendation.**

Although there is a basis for the government to request that this Court to set aside the defendant's plea agreement, in the interests of judicial economy and recognizing the length of a possible sentence within the defendant's presumptive guideline range, the government elects not to pursue that remedy. Instead, the government urges this Court to sentence the defendant to the high end of the guideline range – a term of 327 months' imprisonment – to be followed by a term of supervised release, and enter a forfeiture money judgement in the amount of $15,000,000. The money judgement will allow the government to seize any of the defendant's assets up to that amount wherever it may find them.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____
John S. Kastrenakes    FBN 749214
Assistant U.S. Attorney
Fla. Bar #312827
500 Australian Avenue
Suite #400
West Palm Beach, Florida 33401
Tel:  (561) 659-4772
Fax:  (561) 659-4526

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by United States mail this 19th day of February, 2004, to: Ruben Oliva, Esq., attorney of record for the defendant, 80 SW 8th Street, Suite #1900, Miami, Florida, 33130 and Dulcelina Moore, United States Probation Officer, 300 NE 1st Avenue, Room 315, Miami, Florida, 33132-2126.

By: *[signature]*
for John S. Kastrenakes
Assistant U.S. Attorney